UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

_____

NATHANIAL SHIPMAN,

      Plaintiff,

v.                                                                          No. 1:15-CV-167-BRB-KBM

MICHAEL CARRASCO, a Bernalillo
County Sheriff's Deputy, and
CARL USTUPSKI, a Grants Police
Department Officer,

      Defendants.

_____

ORDER DENYING DEFENDANT CARRASCO'S MOTION FOR SUMMARY
JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY
_____

**BALDOCK**, Circuit Judge.[*]

_____

      Plaintiff Nathanial Shipman stole a bus and drove it for over 60 miles on Interstate 40 between Grants, New Mexico, and Albuquerque, New Mexico. Along the way, various law enforcement vehicles pursued him and attempted to stop him, first by activating lights and sirens, then employing spike belts, and finally executing a precision intervention technique (PIT) that caused the bus to spin, hit a concrete median, and stop. Members of a SWAT team as well as Defendant Michael Carrasco, a Bernalillo County

_____

[*] Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation pursuant to 28 U.S.C. § 291(b).

Sheriff's Deputy, approached the bus to extract Shipman.  While the SWAT team members used less-lethal "bean bag" shotguns, Carrasco used his firearm and shot at Shipman three times, hitting him twice.  Shipman alleges Carrasco used excessive force and sued under 42 U.S.C. § 1983.  Carrasco moves for summary judgment on the basis of qualified immunity.[1]  As explained more fully below, taking the facts in the light most favorable to Shipman shows that Carrasco used deadly force nearly certain to cause serious injury or death when Shipman did not present an immediate threat to Carrasco's or anyone else's safety.  And considering the specific facts in this case, the law was clearly established that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  At this stage of the proceedings, the Court denies Carrasco's motion.

## I.    Evidentiary Objections

Before delving into the facts, the Court addresses Shipman's objections that three types of evidence Carrasco submitted in support of his motion are inadmissible as unauthenticated hearsay: (1) Bernalillo County Sheriff's Office ("BCSO") dispatch audio recordings to which Carrasco was allegedly listening, Exhibits D1–12 (Doc. 18, media exhibit on file with the Court); (2) the Computer Aided Dispatch report ("CAD report"), a digital readout of the South BCSO dispatch channel transmissions that Carrasco could monitor inside his police vehicle, CAD report (Doc. 17-3); and (3) video footage from

---

[1] Defendant Carl Ustupski has not moved for summary judgment and does not take a position on Carrasco's motion.  *See* Motion for Summary Judgment at 1 n.1.

various New Mexico State Police (NMSP) or New Mexico Department of Transportation officers' dashboard-mounted cameras, Exhibits F–M (Doc. 18, media exhibit on file with the Court).  Rule 56 of the Federal Rules of Civil Procedure allows Carrasco to support his factual assertions on summary judgment by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  In response, Shipman may "object that the material cited to support . . . a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

First, Shipman argues that audio exhibits D1–12, the CAD report, and video exhibits F–M are unauthenticated.  In his attorney's Rule 56(d) Affidavit (Doc. 23-3), Shipman asks for additional discovery because "[t]he video of Defendant Carrasco shooting Mr. Shipman has not yet been authenticated by either the Defendant or other witnesses, as no witnesses have yet been deposed and no discovery has yet been conducted."  Rule 56(d) Affidavit ¶ 2 at 1.  He also asserts that he needs to obtain a "certificate of authenticity from [the] records custodian at the Bernalillo County Sheriff's Department to allow the admission" of the CAD report and the dispatch audio recordings. Rule 56(d) Affidavit ¶ 6 at 2.  In response, Carrasco asserts that the Tenth Circuit does "not require an affidavit to authenticate every document submitted for consideration at summary judgment."  *Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009).  Further, Carrasco characterizes Shipman's "authenticity argument" as "puzzling" because Shipman provided both exhibits in his Rule 26(a)(1) Initial

Disclosures.  "It is unclear why Shipman is claiming that evidence *he* provided is not authentic."  Reply ¶ 2 at 2 (Doc. 30).

    The fact that Carrasco obtained the exhibits from Shipman through initial disclosures does not automatically authenticate the exhibits.  Although the Tenth Circuit has stated that "documents produced during discovery that are on the letterhead of the opposing, producing party are authentic per se for purposes of Federal Rule of Evidence 901," the Tenth Circuit has not extended this rule to automatically authenticate everything an opposing party produces.  *Mohawk Constr.*, 577 F.3d at 1170.  Instead, the "proper inquiry" to determine an exhibit's authenticity, and thus one aspect of its admissibility and whether the Court may consider it for summary judgment, is governed by Federal Rule of Evidence 901.  *Id.*  "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  In considering whether the exhibit's proponent has met this burden, the Court may consider, among other things, testimony from a witness with knowledge that the "item is what it is claimed to be," Fed. R. Evid. 901(b)(1), as well as the exhibit's "appearance, contents, substance, internal patterns, or other distinctive circumstances of the item, taken together with all the circumstances," Fed. R. Evid. 901(b)(4); *see also Mohawk Constr.*, 577 F.3d at 1171 (remanding for the district court to consider whether the exhibits submitted on summary judgment might be sufficiently authenticated under rule 901(b)(4)).

From what the Court can tell, Shipman does not argue that the CAD report and audio exhibits D1–12 are anything other than what Carrasco asserts them to be, nor does he argue that they *cannot* be authenticated. "Significantly, the objection contemplated by [the 2010 amendment to rule 56(c)(2)] is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be." *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-CV-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011); *see also In re Gregg*, No. 11-40125-JTL, 2013 WL 3989061, at *4 (Bankr. M.D. Ga. July 2, 2013) ("Thus under current Rule 56, an objection cannot be based solely on evidence not being authenticated—the objection must be that evidence *cannot* be presented in admissible form, not that the evidence *has not* been presented in admissible form." (emphasis in original)).  Indeed, Shipman requested the Court permit discovery so he could obtain a certificate of authenticity to allow admission of the CAD report and dispatch audio recordings.  Rule 56(d) Affidavit ¶ 6 at 2.  This alone indicates to the Court that Shipman agrees these exhibits are authentic, even if not yet authenticated, and that the parties could lay a proper foundation for the exhibits at trial.  And although he argues that the proponent of the evidence "must thoroughly explain the admissible form that they will introduce at trial," Response ¶ 4 at 3 (quoting *Mitchell v. Zia Park, LLC*, 842 F. Supp. 2d 1316, 1321 (D.N.M. 2012)), Shipman himself explains the admissible form of the evidence he expects further discovery will provide.

Further, independent characteristics of the exhibits indicate to the Court they are what Carrasco asserts.  The CAD report indicates on the upper left corner that it is from the Bernalillo County Sheriff's Department, and it appears to be a series of entries

recording the date, time, and content of events reported as well as the operator who provided the information for the log.  In his affidavit, Carrasco explained that, in addition to listening to the South BCSO dispatch channel, he could "monitor a digital readout of the transmissions made, referred to as a 'Computer Aided Dispatch' report" on his in-car computer.  Affidavit of Detective Michael Carrasco ¶ 10 at 2 (Doc. 17-4) ("Carrasco Affidavit").  Carrasco then describes events that align with the CAD report's entries as well as with the transmissions heard in the audio clips.  For example, Carrasco explains in his affidavit that "[a]t approximately 6:26 am, BCSO dispatch stated that NMSP had confirmed they had placed spike strips at mile marker 137."  Carrasco Affidavit ¶ 44 at 7. The CAD has an entry at 6:26 from Natalie Roberts indicating "State police is confirmed spikes at MM 137 set up."  CAD report at 2 (capitalization altered for readability).  And in one of the audio clips, a female states, "10-4, all units be advised state police does have those spikes set up at the 137.  We do have spikes at the 137 that are set up."  Audio Exhibit D6 at 1:49–1:57.  Although the CAD report does not capture verbatim everything in the radio transmissions, nor does the Court have access to all the radio transmissions made during the course of the pursuit, the Court is convinced that the CAD report and BCSO dispatch audio recordings are what the parties assert they are and that the parties will be able to authenticate them for trial.  The Court will thus consider these exhibits for summary judgment.

Similarly, the Court will consider the video clips in Exhibits F–M.  Again, Shipman and Carrasco seem to agree that the videos are what Carrasco asserts: recordings from various New Mexico State police vehicles' dashboard cameras that

recorded events during the pursuit and interaction with Shipman after the bus came to a stop.  Shipman asks for an opportunity to conduct discovery because the videos have not yet been authenticated.  Rule 56(d) Affidavit ¶ 2 at 1.  The videos appear to be from the dashboard cameras of vehicles that pursued the bus, and even though the video may not now be admissible—that is, no affidavits or characteristics of the videos explain from which officer's vehicle the video came or which officers can be seen or heard in the videos—the Court has indications from the parties that they will be able to present the videos in admissible form and properly authenticate the videos if the case proceeds to trial.  To heed the directive to decide qualified immunity at the "earliest possible stage of litigation," and, if appropriate, to allow Carrasco "to avoid the burdens of such pretrial matters as discovery," *Medina v. Cram*, 252 F.3d 1124, 1127–28 (10th Cir. 2001), the Court also believes it is proper to consider the evidence it has available at this time, including the videos in Exhibits F–M.[2]  Had Shipman argued that the videos were not actually what they appear to be, this might be a different case, but even he has indicated in his attorney's affidavit that additional discovery will likely lead to proper authentication of the video exhibits.

Shipman also argues that the exhibits include inadmissible hearsay.  As to the CAD report and audio recordings of the dispatch radio, Carrasco argues that he is not offering them "for the truth of the assertions stated therein, but rather solely for the effect the statements had on Deputy Carrasco" and that he "was entitled to rely upon

---

[2] To the extent Shipman's Rule 56(d) Affidavit requests the Court to defer ruling on the Motion for Summary Judgment, the Court denies the request.  The Court will deny the Motion for Summary Judgment and permit the parties to proceed with discovery.

information provided to him by his fellow officers and dispatch."   Reply ¶ 4 at 3.

Alternatively, he argues the present sense impression exception applies to any hearsay in

the exhibits.  *Id.* (citing Fed. R. Evid. 803(1)).   Considered together with Carrasco's

affidavit, he asserts the CAD report "is simply a digital printout of the radio

transmissions made over the air" and that the "radio transmissions themselves make it

clear that the statements are being made as the speaker is perceiving the events." *Id.*  The

Court agrees with Carrasco that many of the statements made through the dispatch radio

and recorded on the CAD report are not offered for the truth of the matters asserted, but

rather to show what information Carrasco received, which impacted his impression of

Shipman's conduct and dangerousness.   But the Court must individually assess the

various statements Carrasco offers from the exhibits and determine whether he offers

each statement for its truth and, if so, whether the present sense impression or some other

hearsay exception applies.   The Court will clarify its specific hearsay rulings in the

footnotes to the facts.

## II.   Facts

The following facts are either undisputed or construed in the light most favorable

to Shipman.  On March 9, 2012, Shipman stole a bus and drove onto an eastbound on-

ramp of Interstate 40 near Grants, New Mexico.  When he tried to back the bus off the

ramp, he nudged the front bumper of a Grants Police Department ("GPD") vehicle that

Defendant Carl Ustupski had parked behind the bus.[3]   Ustupski fired several shots at

---

[3] Carrasco asserts that Shipman "rammed" into Sgt. Ustupski's unit when Ustupski
attempted to stop the bus, citing as proof Shipman's Complaint, but the Complaint

Shipman.[4]  Shipman fled, driving eastbound on I-40 towards Albuquerque.  Members of

the New Mexico State Police ("NMSP") arrived to assist GPD in the pursuit.

Carrasco, a BCSO deputy nearing the end of his grave-yard shift, was listening to

the South BCSO dispatch channel at 6:15 a.m. and heard dispatch request that two units

report to I-40.  Using the code "34" as BCSO's designation for officers, the dispatcher

stated, "We have a Grants 34 pursuing a stolen bus at this time.  We are being advised

that the bus is ramming into 34s at this time."[5]  Audio Exhibit D2 at 0:03–0:13.  Carrasco

also monitored a digital readout of the transmissions on the CAD report on his in-car

computer.  At 6:14 a.m., the report stated, "40EB Passing the 117[.]  Grants PD pursuing

school bus[.]   Bus rammed into 2 PD units from Grants[.]   One unit discharged of

weapon[.]  Just a heads up[.]"  CAD report at 1 (capitalization altered for readability).  At

6:19 a.m., Carrasco called out on the dispatch radio that he was en route.  When he joined

the pursuit at I-40 near exit 140, he observed numerous law enforcement vehicles from

BCSO, Albuquerque Police Department ("APD"), NMSP, and GPD, as well as unmarked

vehicles with emergency equipment activated, pursuing a yellow school bus.  Despite the

---

supports only that Shipman nudged Ustupski's vehicle and then immediately stopped.
Complaint ¶ 9 at 2–3 (Doc. 1).

[4] For clarity, the Court will refer to the bus driver as Shipman, even though the
officers at the time did not know his identity.

[5] As is true with many of the comments made over the dispatch radio, the Court is
not considering the statement from BCSO dispatch that Shipman rammed into officers as
evidence that Shipman actually rammed into officers, but rather as evidence of what
Carrasco heard over the dispatch radio and the impression he could reasonably form
about Shipman's conduct.

many law enforcement vehicles with emergency equipment activated, including lights and sirens, Shipman continued driving.

At some point during the chase, which lasted another half hour on eastbound I-40, a dispatcher stated over the radio, "Per Grants PD, they are in pursuit of a school bus that was stolen.  It has rammed into two Grants PD units so far.  Shots have been fired from the bus."[6]  Audio Exhibit D4 at 0:10–0:20.  Shortly after that, someone else stated over the radio, "Sam 10, the other 49 that came out was that 34s shot at the bus when the bus tried to ram the units."[7]  Audio Exhibit 10 at 0:02–0:07.  Later, another deputy reported over the radio that the "driver was reaching into the floor panel."[8]  Audio Exhibit D8 at 0:16–0:19.

Carrasco also heard dispatch coordinate and report on the placement of several spike strips along I-40 eastbound, that some of the spike strips "possibly did work," and that "the bus is all over the road."[9]  Audio Exhibit D7 at 0:54–1:00.  A few miles later,

---

[6] The Court does not consider these statements for the truth of the matters asserted, but for the effect they had on Carrasco.

[7] The Court again does not consider this statement for its truth, but for the effect it had on Carrasco.

[8] This may be a present sense impression if it turns out that the deputy reporting this was also the deputy who spotted Shipman reaching down.  The Court, however, does not need to consider the statement for the truth of the matter asserted because Shipman could rely on the report from another officer, regardless of its truth.

[9] To the extent Carrasco relies on the radio transmissions or statements within his affidavit repeating the transmissions he heard over the radio to prove that law enforcement officers actually set up spike strips, the statements are hearsay.  The present sense impression exception to the rule against hearsay does not apply here because the dispatch's directive to set up spike belts does not describe or explain an event or prove

Carrasco observed two law enforcement officers on the side of the road preparing to lay another spike strip.  Shipman was in the far outside lane but swerved towards the officers' position.  A deputy reported over the radio that the driver had attempted to "run us off the road," Audio Exhibit D9 at 0:26–0:29, and that "he tried to ram us as we were deploying spikes," *id.* at 0:38–0:43.[10]  In his affidavit, Shipman stated that he did not intend to hit the officers but swerved to avoid the spike strips and also had difficulty controlling the bus, as he was in pain from being shot by Ustupski, was bleeding profusely, and was driving on the rims of the bus.  Affidavit of Nathaniel Shipman ¶ 8 at 2 (Doc. 21-11) ("Shipman Affidavit").  Another officer reported over the dispatch radio, "Sam 9 to the units that are directly behind me, back off a little bit.  GPD's around in case they want to take a different avenue."  Audio Exhibit D9 at 0:01–0:10.  And that same officer again said, "10-9 to the SO units.  Go ahead and back out.  Let state police take over.  We're going to go to the termination point if anything,"[11] *id.* at 1:08–1:15.

---

that the officers followed through with the order.  *See* Fed. R. Evid. 803(1).  But the Court can rely on video footage showing officers setting up spike strips to support that at least some officers from some police department set up spike strips in Shipman's path. The actions depicted in the video are not statements, and thus, not hearsay.  This summary judgment motion does not turn on the specifics of which law enforcement officers placed the spike strips at which mile markers, and so the Court recounts what Carrasco heard regarding the placement of spike strips as background information potentially affecting Carrasco's evaluation of the situation.

[10] The Court considers this statement for its effect on Carrasco.  Whether Shipman actually intended to hit the officers is a disputed fact.

[11] It is unclear whether the person speaking on the radio stated "if anything" or "if they need."  Either way, the message Carrasco received is roughly the same.  Further discovery might show exactly what instructions Carrasco received, but the Court notes these messages, taken in the light most favorable to Shipman, shows that Carrasco heard

At 6:41 a.m., the CAD report stated, "S9 wants our units to move back . . . . Speeds are 40 MPH . . . SP is trying to PIT at this time."[12]   CAD report at 4 (capitalization altered for readability) (ellipses in original).   At 6:46 a.m., the report stated, "Per NMSP adv [sic] to have our units stay bhnd [sic] the SP units they [a]re trying to come up on the side."[13]   CAD report at 4.   Two separate NMSP sedans then made several unsuccessful attempts to stop the bus by performing a PIT maneuver before pulling off to the side of the road.   Video Exhibit J at 21:12–23:25; Video Exhibit G at 19:55–21:30; Video Exhibit K at 00:00–03:21.   Finally, a third unmarked NMSP SUV successfully performed the PIT maneuver and caused the bus to spin counterclockwise. Video Exhibit I at 27:25–27:45.   At 6:48 a.m., the bus came to a stop between the Coors and Rio Grande exits on I-40 facing southwest in the left-hand eastbound land.   The hood of the bus was up and the engine was not running.

One unmarked NMSP SUV stopped east of the bus, but the remaining law enforcement vehicles stopped west of the bus.   Video Exhibit F at 37:31–37:39; Video Exhibit M at 20:16–20:22.   Carrasco, who was also parked west of the bus, exited his vehicle and moved behind a NMSP vehicle for cover before approaching the bus.   Video Exhibit F at 37:47–38:06.   Carrasco thought he heard engine sounds as though Shipman

---

at least some instructions to stay back during the pursuit and to defer to the state police. "Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."   *United States v. Ballou*, 59 F. Supp. 3d 1038, 1073 (D.N.M. 2014) (quoting *United States v. Bellomo,* 176 F.3d 580, 586 (2d Cir. 1999)).

[12] The Court considers this statement for its effect on Carrasco.

[13] The Court considers this statement for its effect on Carrasco.

were attempting to restart the bus and was concerned that, if successful, Shipman could maneuver the bus past the police vehicles surrounding it, given the bus's size and Shipman's prior willingness to collide with police vehicles.  If Shipman evaded police and continued eastbound on I-40, Carrasco thought Shipman could reach rush hour traffic in Albuquerque.[14]   Carrasco Affidavit ¶ 90 at 9; *id.* ¶¶ 95–99 at 9–10.  On the video footage showing Carrasco approaching the bus, an unknown officer stated, "Hold on, hold on," "Stay there, stay there," and "We've got enough, we've got enough."[15]   Video Exhibit F at 37:56–38:05.  It is unclear who the officer making these statements was speaking to and whether Carrasco could hear him.  As Carrasco approached the bus, he noticed several other law enforcement officers, who he did not recognize, reach the bus before him and form a "stack" to the left side of the open bus door.  Video Exhibit I at 28:00–28:15; Carrasco Affidavit ¶ 103 at 10.  One officer stated, "I got a bean bag."[16]  Video Exhibit I at 28:05–07.  Carrasco could hear that the other officers were speaking, but he could not determine exactly what they were saying, and he thought the officers were giving commands to Shipman.  Carrasco Affidavit ¶¶ 106–07 at 10.  Carrasco did not communicate with any of the other law enforcement officers on the scene.  *Id.* ¶ 108 at 10.  He did not stand in the stack himself but instead moved slightly to the right of the open bus door and towards the front of the bus.  *Id.* ¶ 109 at 11.  His intent was to provide

---

[14] The Court will analyze in its analysis whether Carrasco's belief was reasonable.

[15] As noted before, statements offered as evidence of commands are not hearsay.

[16] This statement is admissible as a present sense impression.

13

cover for the officers in the stack, and from this angle, he could see through the bus's front windshield.  *Id.* ¶ 110 at 11; Video Exhibit I at 28:16–18:19.  Carrasco did not intend to remove the driver from the bus because he believed the other officers would take care of handling the driver.  Carrasco Affidavit ¶ 111 at 11.  Carrasco observed the officers in the stack with their weapons drawn but did not recognize their weapons as "less-lethal" weapons.  *Id.* ¶¶ 112–15 at 11.  In fact, the officers who approached in the stack were members of the SWAT team and used less-lethal "bean bag" shotguns. Carrasco has never received any SWAT training and, before that day, had never received any training with a bean bag shotgun, had never fired a bean bag shotgun, and had never heard a bean bag shotgun being fired.  Carrasco Affidavit ¶ 105 at 10; *id.* ¶ 119–121, at 12.  Carrasco was still moving towards the bus when he heard several bangs from his left, where the other officers were approaching the bus.  *Id.* ¶ 118 at 12.  Almost simultaneously with the first bang, Carrasco saw Shipman jerk in his seat.  *Id.* ¶ 122 at 12.  Carrasco was looking at Shipman through the windshield but could not see Shipman's hands.  Interview with Michael Carrasco at 43:14–15; 55:16–17 (Doc. 23-4) ("Carrasco Interview").[17]  Carrasco then saw what appeared to him as Shipman bending down and reaching towards the floor of the bus, then sitting back up and turning towards the officers in the stack.  Carrasco Affidavit ¶¶ 124–127 at 13.  This entire motion took place within seconds.  *Id.* ¶ 128 at 13.  Believing Shipman had retrieved a firearm from the floor of the bus and was preparing to shoot the officers approaching the bus from the

---

[17] Carrasco's statements in his interview are not hearsay because Shipman is offering the statements against Carrasco.  *See* Fed. R. Evid. 801(d)(2)(A).

14

side, Carrasco fired three shots with his firearm at Shipman.  *Id.* ¶¶ 129–130 at 13.  But Shipman did not have a weapon and said in his affidavit that he was not reaching down to retrieve anything from the floor, but was in a massive amount of pain from the SWAT officers' non-lethal rounds and was unable to control the movement of his body. Shipman Affidavit ¶ 11 at 3.  After Carrasco fired, another officer approached him and angrily ordered him away from the ongoing SWAT operation, and Carrasco stepped away from the scene.  Video Exhibit I at 28:18–28:29; Video Exhibit F at 38:10–38:16. No other officer employed lethal force against Shipman once the bus had been disabled. Shipman apparently underwent surgery because of the gunshot wounds but survived.

### III.    Legal Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material when it "might affect the outcome of the suit under the governing [substantive] law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

To resolve questions of qualified immunity at summary judgment, the Court engages in a two-pronged inquiry, but it has discretion to decide the prongs in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The first prong asks "whether the

facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (per curiam) (alterations omitted) (internal quotation marks omitted).  The second prong asks whether the right in question was "clearly established" at the time of the violation.  *Hope v. Pelzer,* 536 U.S. 730, 739 (2002).  "A right is clearly established if it would be clear to a reasonable officer that his conduct was unlawful in the situation."  *Maresca v. Bernalillo Cnty.*, 804 F.3d 1301, 1308 (10th Cir. 2015).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson*, 555 U.S. at 231.

## IV.   Analysis

### A. Constitutional Violation

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989).  To determine whether Carrasco used excessive force, the Court asks the overarching question whether Carrasco's actions were objectively reasonable in light of the facts and circumstances he faced, without regard to his underlying intent or motivation.  *Id.* at 397.  While the facts and all reasonable inferences from the evidence are to be taken in the light most favorable to Shipman as the non-moving party, the Court must analyze the *reasonableness* of Carrasco's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20

16

vision of hindsight." *Id.* at 396; *see also id.* at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").  The Court weighs the "nature and quality" of the intrusion on Shipman's Fourth Amendment interests against "the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007).  Some factors that have been useful to conduct this balancing test include the severity of the crime at issue, whether the suspect was actively resisting arrest or attempting to evade arrest by flight, whether the suspect posed an immediate threat to the officer's or others' safety, *Graham*, 490 U.S. at 396, and whether the officer's own reckless or deliberate conduct brought about the need to use deadly force, *Thomas v. Durastanti*, 607 F.3d 655, 667 (10th Cir. 2010).

### 1.  *Near certainty of serious bodily injury or death*

First, the Court considers the nature and quality of the intrusion on Shipman's Fourth Amendment interests.  The Tenth Circuit has acknowledged that there is a "spectrum" of deadly force, and the Court must consider where along this spectrum Carrasco's conduct lies.  *Cordova v. Aragon*, 569 F.3d 1183, 1189 (10th Cir. 2009) ("*Scott* strongly suggests that the reasonableness balancing must take into account that there is a spectrum of 'deadly force,' and that just because a situation justifies ramming does not mean it will justify shooting a suspect in the head.")  Carrasco fired three shots with his firearm at Shipman, aiming "center mass."  Carrasco Interview at 66:18–25.  Based on the evidence that Carrasco shot his firearm at Shipman and aimed center mass,

17

it is clear that his actions posed the near certainty of serious injury or death to Shipman. *See Scott v. Harris*, 550 U.S. at 383 (comparing the "high likelihood of serious injury or death" when the officer rammed his vehicle's bumper into the fleeing motorist's vehicle to the "near *certainty* of death posed by . . . shooting a fleeing felon in the back of the head, or pulling alongside a fleeing motorist's car and shooting the motorist" (citations omitted) (emphasis in original)).   "A police car's bumping a fleeing car is, in fact, not much like a policeman's shooting a gun so as to hit a person."  *Id.* at 383.

### 2. *Severity of the crime at issue*

When an officer has probable cause to believe the suspect "has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."  *Garner*, 471 U.S. at 11–12.  In contrast, when an officer is "faced with somebody who had committed a misdemeanor in a particularly harmless manner," this fact "reduces the level of force" the officer may reasonably use.  *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007); *see also Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) (noting that if the plaintiff had committed disorderly conduct, "his infraction would be among the least severe crimes contemplated by New Mexico law, and the amount of force used should have been reduced accordingly").

Here, Carrasco heard a number of reports through the dispatch radio regarding potential crimes Shipman committed.  Carrasco could reasonably rely on those reports, even if they included some false or misleading information, to analyze Shipman's conduct.  "[E]ffective law enforcement cannot be conducted unless police officers can act

18

on directions and information transmitted by one officer to another and . . . officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *United States v. Hensley*, 469 U.S. 221, 231 (1985).  For example, Carrasco could reasonably believe Shipman had: (1) stolen a bus, constituting unlawful taking of a motor vehicle in violation of N.M. Stat. Ann. § 30-16D-1, a fourth degree felony for a first offense; and (2) rammed into police officers,[18] constituting aggravated battery on a police officer with a deadly weapon in violation of N.M. Stat. Ann. § 30-22-25(C), a third degree felony.  Additionally, Carrasco could form probable cause that Shipman committed a number of additional crimes based on Carrasco's own observations in combination with the radio dispatches, including: (1) refusing to pull over when numerous police vehicles engaged emergency lights, attempting to evade spike strips, and losing control of the bus and swerving on the road, constituting aggravated fleeing from a law enforcement officer in violation of N.M. Stat. Ann. § 30-22-1.1, a fourth degree felony; (2) reckless driving in violation of N.M. Stat. Ann. § 66-8-113; and (3) swerving towards police officers who had placed a spike belt to

---

[18] Carrasco stated in his affidavit that he believed the bus had actually struck police officers, not just the police officers.  Shipman argues Carrasco's belief was unreasonable.  Although the facts taken in the light most favorable to Shipman show that the bus merely nudged a police vehicle, Carrasco's mistakes as to the facts—whether Shipman rammed or bumped into the "34s" and whether he took that action against police officers or just the police vehicles—were reasonable mistakes based on Carrasco's heeding the information from dispatch, on which he was entitled to rely.  "An officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances."  *Durastanti*, 607 F.3d at 666.

try to hit them with the bus,[19] constituting assault with intent to commit a violent felony upon a peace officer, in violation of N.M. Stat. Ann. § 30-22-23, a second degree felony.

Carrasco also asserts he had probable cause to believe Shipman committed two additional crimes, but viewing the evidence in the light most favorable to Shipman, the Court disagrees.  First, Carrasco argues he had probable cause to believe Shipman fired shots at a Grants police officer, constituting assault with intent to commit a violent felony upon a peace officer, in violation of N.M. Stat. Ann. § 30-22-23.  But the facts taken in the light most favorable to Shipman do not support this belief.  Although one radio transmission indicated shots had been fired "from the bus," a subsequent dispatch stated that "the other 49 that came out was that 34s shot at the bus when the bus tried to ram the units."  A fact question remains as to whether this subsequent radio transmission corrected the earlier transmission.  If it did, Carrasco no longer had probable cause to believe Shipman shot at a police officer.  If it did not, the subsequent transmission may have added to the confusion and therefore justified Carrasco's belief that Shipman may have been armed.  Carrasco also asserts he had probable cause to believe Shipman deliberately collided with the NMSP sedans attempting to stop him through the PIT maneuver, constituting aggravated battery on a peace officer in violation of N.M. Stat. Ann. § 30-22-25.  But the video footage viewed in the light most favorable to Shipman, even while considering what a reasonable officer on the scene could believe, raises a

---

[19]  Although whether Shipman intended to hit the officers is a disputed fact, he admitted that he swerved to avoid the spike belt and in so doing, swerved toward the officers.  A reasonable officer viewing these events could form probable cause to believe Shipman intended to hit the officers.

question of fact whether Shipman deliberately collided with the NMSP sedans.  A jury could conclude that the NMSP sedans collided with the bus to perform the PIT maneuver and Shipman swerved in response in an attempt to regain control.

Even without probable cause to believe Shipman had shot a firearm at an officer or intentionally collided with the NMSP sedans, however, Carrasco had probable cause to believe Shipman had committed a number of crimes, most seriously assault with intent to commit a violent felony upon a police officer by swerving towards officers who had set up a spike belt.

### 3.  *Attempt to resist arrest or evade arrest by flight*

There is no doubt that Carrasco faced a suspect who demonstrated he would go to great lengths to resist arrest.  By the time the bus stopped, numerous police vehicles had pursued Shipman for at least half an hour and over sixty miles.  Shipman continued driving even when his tires had blown out and he had to drive on the rims of the wheels. He continued driving when three separate NMSP sedans attempted to stop him through a PIT maneuver.   And when Carrasco approached the bus, Shipman was attempting (although failing) to get the bus started again to continue his escape.  Shipman admitted that his "manifest intentions were to continue running from the police."  Response at 24. Shipman had demonstrated through the pursuit that he would not give up easily and would continue fleeing or resisting arrest if given the chance.  That said, the facts taken in the light most favorable to Shipman show that at the moment Carrasco approached the bus, Shipman was, at most, attempting to restart the bus and not fleeing on foot.

### 4.  *Immediate threat to the safety of the officers or others*

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  *Garner*, 471 U.S. at 11–12. Carrasco asserts two theories to support his belief that Shipman posed an immediate threat: (1) he reasonably believed Shipman presented a serious threat to people on the interstate if he escaped with the bus; and (2) he reasonably believed Shipman had a firearm and intended to use it against the officers.  Undoubtedly, "if threatened by a weapon (which may include a vehicle attempting to run over an officer), an officer may use deadly force."  *Durastanti*, 607 F.3d at 664.  And although Carrasco did not have to ignore the events he perceived or learned about during the bus chase, "circumstances may change within seconds eliminating the justification for deadly force," and the Court must consider whether Carrasco "could have reasonably perceived he was in danger at the *precise moment* that he used force."  *Id.* at 664, 666; *cf. Phillips v. James*, 422 F.3d 1075, 1083 (10th Cir. 2005) ("[A]lthough the precise moment before [the officer] shot is a critical factor, the events leading up to that moment are also extremely relevant.").

Carrasco points to a number of cases involving vehicle chases where officers were justified in using deadly force to bring the chase to an end, including *Scott v. Harris*, 550 U.S. 372 (2007), and *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014).  The Court agrees that, during the pursuit, Carrasco would have been justified in believing Shipman posed a serious and immediate risk to any vehicles or people who were potentially on the interstate in the bus's path.  That is likely why Shipman did not bring a claim against the

multiple NMSP officers who attempted to stop him using the PIT maneuver.  *Cf. Scott*, 550 U.S. at 381 (holding that the officer who ended a car chase by ramming the fleeing motorist's vehicle, causing the vehicle to crash and rendering the motorist a quadriplegic, did not violate the Fourth Amendment).  But Carrasco did not shoot while the bus was still moving and posing such a risk.  Instead, when Carrasco approached the bus, it had come to a complete stop and was no longer running.  It may have been unclear to Carrasco whether the bus was completely disabled, but the threat of the bus getting back on the road at high speeds and posing a threat to other drivers was diminished.  Not only had it come to a complete stop, but it was also nearly surrounded by police vehicles. Further, the facts taken in the light most favorable to Shipman do not indicate that the bus posed a threat to the officers at the time Carrasco shot Shipman.  The bus was not running and Shipman was not able to restart it, nor was it rolling forward.  *Cf. Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005) (concluding the officer did not use excessive force when he was "standing in a narrow space" between the suspect's vehicle and another vehicle, the suspect disobeyed orders to put his hands up, the suspect's vehicle was "suddenly moving forward" at one to two miles per hour and the officer "had to make a split-second decision of whether he could escape before he got crushed").  And Carrasco specifically disclaims any argument that he or the other officers were at risk from the bus running into them.  *See* Reply at 14 ("Deputy Carrasco does not claim that he fired because he thought that Shipman was going to strike him with the bus.").  Taking the facts in the light most favorable to Shipman shows that the threat from Shipman using

the bus as a deadly weapon against the officers or others had dissipated when Carrasco approached the bus.

The more difficult question is whether Carrasco reasonably believed Shipman had a firearm and was bringing it up to shoot the police officers.  Carrasco believed Shipman might be armed because (1) he heard a radio dispatcher state that shots had been fired from the bus; (2) a deputy reported over the radio that Shipman had been reaching down towards the floorboard of the bus; and (3) as he approached the bus—simultaneously with the shots from the officers—he saw what appeared to him as Shipman bending down and reaching towards the floor of bus, sitting back in his seat, and turning towards the officers in the stack outside the bus.  As the Court explained earlier, Carrasco cannot rely on the report that shots had been fired from the bus.  A reasonable jury could find that a subsequent dispatch corrected that the shots had been fired *at* the bus.  That leaves the reports that Shipman was reaching to the floorboards of the vehicle and Carrasco's own observations that Shipman reached to the floor of the bus before sitting up and turning towards the officers who had already been shooting him with beanbag shots.  Carrasco and Shipman tell different stories about what happened here.  Carrasco says he saw Shipman jerk in his seat, bend down towards the floor of the bus, straighten up in his seat, and turn towards the officers in the stack approaching the bus from the passenger side.  This took place in a matter of seconds.  Although Carrasco apparently could not see below Shipman's waist and could not see Shipman's hands, Carrasco explains he believed Shipman was reaching for a firearm from the floor of the bus and was preparing to shoot the officers.  In contrast, Shipman explains in his affidavit that he "did not reach

24

down to retrieve anything from the floor once the bus was stopped, as there was no weapon to retrieve or reach for." Shipman Affidavit ¶ 11 at 3. Instead, he was "in a massive amount of pain due to the impact of the SWAT officers' non-lethal rounds" and was "unable to control the movement of [his] body." Shipman Affidavit ¶ 11 at 3. Shipman does not dispute that he reached down; he only disputes that he reached down to retrieve anything. But his point that he was unable to control the movement of his body is well made. A reasonable inference is thus that Carrasco should have recognized that Shipman was only reacting involuntarily to the beanbag rounds rather than deliberately reaching down.[20] That leaves the report that Shipman had reached down to the floorboard of the bus once during the pursuit. This information, standing alone, would not give Carrasco probable cause to believe Shipman had a firearm.[21]

---

[20] That a jury could conclude that Carrasco should have recognized that Shipman was acting involuntarily sets this case apart from *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991). In that case, police chased a vehicle that was the suspected getaway car for a robbery at a convenience store. *Id.* at 495–96. After the car came to a stop, an officer repeatedly ordered the occupants to raise their hands. The plaintiff, sitting in the passenger seat, repeatedly raised and lowered his hands, the final time leaning away from the officer and reaching down further into the floorboard before sitting up. The officer feared the passenger had picked up a gun, although the passenger did not in fact have a weapon. The officer shot the passenger once in the head, killing him. *Id.* at 496. The Fifth Circuit held that the officer did not use excessive force. *Id.* at 500. Unlike *Reese*, a jury here could conclude that a Shipman was obviously involuntarily leaning down rather than intentionally ignoring police orders and potentially reaching for a weapon.

[21] The Tenth Circuit has also specified a number of nonexclusive factors to determine if officers are at risk, including "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). These factors are not particularly relevant in this case as none of the officers saw Shipman with

The Court notes the difficult position Carrasco faced in trying to determine if Shipman was reaching for a weapon.  Certainly a "reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'"  *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (quoting *People v. Morales*, 603 N.Y.S.2d 319, 320 (N.Y. App. Div. 1993)).  And a jury might find facts in favor of Carrasco rather than Shipman that would support his belief that Shipman was reaching for a gun.  But taking the facts in Shipman's favor, as the Court must at this stage, Carrasco did not have probable cause to believe Shipman was armed.  Thus, Carrasco faced a felon who had been dangerous while driving the bus, but was now essentially unarmed as his dangerous weapon—the bus— had come to a complete stop and was disabled.

### 5.  *Other circumstances*

In considering the totality of the circumstances Carrasco faced, the Court also makes a few additional observations.  First, the fact that the SWAT members used less-lethal beanbag rounds rather than lethal weapons does not necessarily answer whether Carrasco used excessive force.   "[O]fficers are not required to use alternative, less intrusive means if their conduct is objectively reasonable."  *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004).

---

a weapon.  None of the officers ordered Shipman to drop any weapon, and Shipman's reaching down could be interpreted as involuntary motion rather than a hostile action. The distance separating the officers and Shipman was not great—they were a few steps outside of the bus—but since Shipman was not threatening them with a weapon, this distance is not particularly noteworthy.  And the Court has already analyzed Shipman's manifest intentions to avoid arrest.

Second, in viewing the video exhibits Carrasco submitted to the Court, it is hard to ignore what sounds like other officers directing Carrasco not to approach the bus. Together with the audio dispatch recordings and CAD report, the evidence suggests that the NMSP had directed the BCSO officers to stay back during the pursuit, and possibly after the pursuit ended as well.  A reasonable jury could conclude Carrasco ignored these orders.  Shipman repeatedly argues that Carrasco ignored directions and "approached with the SWAT group despite never having been assigned to that group or given permission to approach the bus with that group."  Response at 27.  Shipman does not explain exactly how he sees this conduct as relevant, but the Court considers the totality of the circumstances in determining whether Carrasco's conduct was reasonable.  *See Garner,* 471 U.S. at 8–9 (recognizing courts should ask "whether the totality of the circumstances justified a particular sort of search or seizure").  And whether Carrasco ignored commands to let the state police take over and allow the SWAT team approach the bus alone is relevant in determining what a reasonable officer on the scene would have done.  Taking the facts in the light most favorable to Shipman, Carrasco ignored the commands to stay back, approached a group of officers he did not know and who were using commands he was not familiar with, and stood at a place where his view was partially obstructed, while the SWAT officers stood together in a stack where they could see more of Shipman's body.  A jury could thus find that Carrasco inserted himself into a situation where he was more likely to misunderstand or mishear the command to use less lethal weapons and where he was more likely to misinterpret Shipman's actions as threatening.  *See Sevier v. City of Lawrence*, 60 F.3d 695, 701 & n.10 (10th Cir. 1995)

27

(noting that the district court may have denied summary judgment "on the finding that there was conflicting evidence as to whether the officers precipitated the use of deadly force by their own actions during the course of the encounter immediate prior to the shooting," including whether they acted recklessly in confronting the victim "without gathering more information on the situation").  The fact that Carrasco may have ignored orders in approaching the bus did not *create* the need to use force; that is, there is no evidence that Carrasco's conduct made Shipman react in a more threatening manner than he would have had Carrasco stayed back.  But his conduct in ignoring orders still bears on the reasonableness of his actions.

After considering the totality of the circumstances, interpreting the facts in the light most favorable to Shipman, and analyzing the reasonableness as an officer on the scene, the Court concludes that a reasonable jury could find that Carrasco used excessive force when he shot Shipman with his firearm—force that was nearly certain to cause serious injury or death—when Shipman did not pose an immediate threat to Carrasco or the other officers.  A jury will need to resolve the disputed facts in this close case.

### B. Clearly Established

Although taking the evidence in the light most favorable to Shipman leads the Court to conclude that Carrasco used excessive force, this is not the end of the analysis. Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Hope*, 536 U.S. at 739.  "A right is clearly established if it would be clear to a reasonable officer that his conduct was unlawful in the situation."  *Maresca*,

28

804 F.3d at 1308.  This generally means there "must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.*  The Tenth Circuit has stated that "the general principle governing the use of force is clearly established: deadly force is justified only if a reasonable officer in the officer's position would have probable cause to believe that there was a threat of serious physical harm to himself or others." *Cordova*, 569 F.3d at 1192.  "When a clearly established right depends on the application of a general principle of law to a particular set of facts, 'its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008) (quoting *Hope*, 536 U.S. at 739).

The problem for Carrasco here is that the Court must still consider whether Carrasco violated clearly established law "in light of the specific context of the case," construing the facts "in a light most favorable" to Shipman as the non-movant.  *See Brosseau v. Hagen*, 543 U.S. 194, 195 (2004) (per curiam).  The Court is careful "not to define a case's 'context' in a manner that imports genuinely disputed factual propositions" that Carrasco set forth.  *See Tolan*, 134 S. Ct. at 1866 ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard.").  Viewing the record in the light most favorable to Shipman, the Court has already determined that based on the pleadings and briefs Carrasco "did not have 'probable cause to believe that there was a serious threat of serious physical harm' to himself or others." *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th

29

Cir. 2010) (quoting *Walker v. City of Orem*, 451 F.3d 1139, 1159 (2006)).  The law is clearly established that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  *Garner*, 471 U.S. at 11.  And more specifically, the law was clearly established that a police officer may not shoot his firearm at a felon whose vehicular flight had come to an end when the officer did not have probable cause to believe the felon had a deadly weapon or otherwise posed a serious threat of serious physical harm to himself or others.

Although the facts are not identical, the circumstances of this case are similar to *Walker v. City of Orem*.  In that case, like here, the suspect had stolen a vehicle and eluded officers during a vehicular chase, but the chase had come to a stop.  451 F.3d at 1160.  When the officer approached the suspect, the suspect was holding a knife to his own wrist and was not advancing on anyone.  *Id.*  Although the officer stated he believed the suspect was pointing a gun at him, the belief was not reasonable when the facts were viewed in the nonmovant's favor.  *Id.*  The officer's decision to shoot the suspect, who was not actively resisting arrest, was unreasonable.  *Id.*  Admittedly, there are some differences—for example, Shipman was more dangerous while he was driving and demonstrated he was willing to threaten officers' safety in his attempt to evade the police. And while Carrasco did not need to ignore this context, he did need to consider the immediate circumstances facing him, which revealed that the primary risk of the bus being used against officers or civilians had come to an end.  Under these circumstances as a reasonable jury could find, the law was clearly established that Carrasco could not use

30

force nearly certain to cause serious injury or death against a previously-fleeing felon whose flight had come to an end and did not pose an immediate threat to anyone.

To the extent Plaintiff Nathanial Shipman's Rule 56(d) Affidavit (Doc. 23-3) requests the Court to defer ruling on the motion for summary judgment, the request is DENIED. Defendant Carrasco's Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. 17) is DENIED.

Entered for the Court
this 19th day of July, 2016.


_____
Bobby R. Baldock
United States Circuit Judge
Sitting By Designation